I represent Palladin Associates, Inc., and Marie Owens doing business as Palladin Associates. This is a seven-and-a-half-year-old antitrust case against Montana Power Co. and its wholly owned subsidiary, which is known as NARCO. With me at council table this morning is Rick Swinney. He is the other principal in Palladin, and he is the husband of Ms. Owens. I wish to reserve five minutes for rebuttal, if I may. The analysis of this appeal really can be grouped into three topic areas. The first one relates to Palladin's Northern On-System Claims for Conspiracy to Monopolize, Boycott, and Tying. The second area relates to Palladin's Southern End-of-System Claims for Attempted and Actual Monopolization Relating to an Essential Facility. The third topic area relates to sanctions that were subsequently imposed against Palladin relating to the discovery of certain experts. On the antitrust claims, I submit that the resolution here is very simple. It only involves the application of standard summary judgment rules of evidentiary construction. The evidence has to be interpreted in Palladin's favor. On any disputed issue of fact, Palladin's version of the facts has to be taken as true, and all reasonable inferences have to be drawn in favor of Palladin from the evidence. And then finally, and most critically of all, Palladin's evidence has to be considered collectively as a whole, rather than each item being compartmentalized and then separately parsed in a vacuum apart from all the other items of evidence. We submit that when these rules are applied, that Palladin has more than sufficient evidence from which a reasonable jury can find in its favor on its antitrust claims, and that that precludes summary judgment. With those standards in mind, I'd like to address first some common elements relating to the Northern On-System claims, and the common elements there are joint... I'm sorry, I couldn't hear what you're relating to what? The Northern On-System claims, Your Honor, and those are conspiracy to monopolize, boycott, and tying. And the elements that they have in common are joint action, concerted enterprise, and also anti-competitive effects. For joint action or concerted enterprise, all there has to be is a conscious commitment to a common objective, which is unlawful. And whether an objective is unlawful, it can be unlawful in two ways, if it produces anti-competitive effects or if it has an unlawful purpose. Here, Palladin has presented both direct and circumstantial evidence on all those points. As to concerted action, we have a number of express written agreements between Montana Power and its co-conspirator, Northridge, making assignments of Montana Power's NOVA firm delivery capacity to Northridge on behalf of non-corp customers. Six of those were for five years, and there are numerous other ones that were for one year or less. It's undisputed that they entered into these written agreements, and that constitutes a meeting of the minds, which in and of itself is direct evidence of antitrust conspiracy. Well, hold on a second. Yes, Your Honor. It's evidence that they have an agreement. Yes, Your Honor. It's evidence of the concerted action joint enterprise component. Correct, Your Honor. Okay. But let's, you know, let's get into the heart of it. Yes, sir. Don't you have to show either that what was done was per se unlawful or a conspiracy and restraint of trade, or that under a rule of reason approach, the anti-competitive effects outweigh the legitimate justifications? Yes, Your Honor. Yes, Judge Gould, with one exception, and that is on the conspiracy to monopolize, which is really a Section 2 claim. I'm talking about your Section 1 claim. Yes, Your Honor. We have to show per se or a rule of reason. That is correct. You know, there is extensive evidence here of anti-competitive effects. There is evidence that there was a 22.5% price differential included in the Montana Power Northridge assignments. So are you not contending it's per se unlawful? No, Your Honor. I think the per se argument is subsumed under the rule of reason argument. For example, on the boycott claim, you can't have a per se boycott unless it's horizontal between competitors at the same level. So your whole case is based on a rule of reason claim, then? No, Your Honor. I'm saying that the per se is subsumed within that. We're arguing if we meet the rule of reason, we can certainly show the per se, because NARCO and Montana Power are one entity for antitrust purposes, because NARCO is a wholly owned subsidiary. NARCO was a gas marketer, and Northridge was a gas marketer. What I'm trying to do, I think I understand who they are. What I want to understand is, I know what a rule of reason analysis is. Yes, Your Honor. I just want to understand if before we get to that, we don't have to do a rule of reason  That is correct, Your Honor. I just want to know, are you contending that this is per se unlawful? Yes, both, yes. Bar then, I'd like to know your basis for that before you proceed to rule of reason. Certainly, Your Honor. In terms of per se unlawfulness of the boycott, you have a horizontal agreement here between Montana Power and NARCO being one entity, NARCO being the gas marketer, and Northridge, which was also a gas marketer. So they're at the same level of competition. What they did was foreclose Paladin from access to customers, the non-core customers, who were essential in order for Paladin to compete on system. That is, those essentially are the elements of a per se boycott. You're saying that Montana Power and Northridge are horizontal competitors? I am, because Montana Power and NARCO are one entity, because NARCO is a wholly owned entity. They can't conspire for antitrust purposes. They are treated as one entity. So that makes Montana Power a natural gas marketer, because it's wholly owned subsidiary is a natural gas marketer, and Northridge is a natural gas marketer. So as to the boycott, yes, they are horizontal competitors. As for tying, you don't have to show that. For tying, the conspiracy is made out simply between Montana Power and the non-core customers who agreed to the tying arrangement. The elements of a per se tie are two separate products, which there were here. That was firm gas delivery on the one hand, and then the five-year assignments on the other. Then the foreclosure of a not insubstantial amount of competition to Paladin, and it was foreclosed from being able to compete for the non-core customers, because they'd been signed up and locked up for five years. When those two components are met, it's only necessary that anti-competitive forcing be probable. Here, I think anti-competitive forcing speaks for itself, because there was a 22.5 cent price differential component, and nonetheless, the consumers all signed up with the Montana Power, Northridge, essentially joint venture, to accept those assignments. That's not what they would have done in a competitive market. I think the standards for per se boycott and per se tying are met, but I think it's clear there are anti-competitive effects here. There's the higher prices for consumers. When you factor in the 22.5 percent component, what you find is that Paladin's prices were lower and no less than equivalent to those of Montana Power and Northridge. In addition to that, there are very clear resulting anti-competitive effects here. What happened was that Paladin got caught in this squeeze, where it was foreclosed from having access to these customers. Meanwhile, it was on the hook under its NOVA contract for $800,000 a year in demand charges, that it had to pay whether it was able to sell the gas or not. Is that Montana Power's fault that Paladin would have entered into a contract? Not from an antitrust standpoint, Your Honor, but what is Montana Power's fault is that it foreclosed Paladin from having an equal opportunity to compete for these customers. If Montana Power had wanted this to be handled in a pro-competitive fashion, it could have offered assignments to these customers, but it would have offered them for one year, not five. Five is very atypical in the gas industry. One year or less is typical. Two, it would not have coupled the five-year assignment with a $20 per MCF upfront assignment fee. Three, it would not have put the customers on the hook for the NOVA demand charges for five years. That combining those factors prevented Paladin from being able to compete for those customers for any time for five years. Well, yes, that is to say they signed a five-year contract. They did, Your Honor, but what Montana Power offered in terms of the five years is very atypical. The multi-year contracts are typical only for large volumes, 10,000 and up. That's what the evidence in this case shows. These were much smaller volumes, and the smaller volumes are generally handled with one-year or shorter contracts. And what's your theory as to why, assuming it's atypical in the particular market, what's your theory as to why atypicality would make it illegal? It doesn't necessarily make it illegal, but it shows the unlawful purpose, Your Honor. It shows that the purpose was to lock them up for this period. And what happened, as soon as Paladin has gone from the market, and as soon as these five-year contracts expire, what happened? Montana Power turns around and goes to one-year assignments. That's what they did. And I think from that, you can clearly infer that their purpose was to lock these customers away from Paladin. Their purpose is to get a five-year contract, right? That was the first purpose. From how many customers? Initially six, Your Honor. How many potential customers are there in the state? In terms of those non-core customers, I think there were six there, and Paladin at other times had four. There was something like 10 or 11, Your Honor. But you just told me that these are relatively small volume. I thought these were big volume customers. Yes. These, the amounts that were subject to the five-year assignments were relatively small. But what happened was, once the customer signed these five-year assignments with Montana Power Narco, they then took additional gas from Montana Power Narco, I'm sorry, Narco, Northridge, I misspoke. They took additional gas during the period of those assignments, so it's like the angler setting the hook in the fish's mouth. Once they have those customers on the line, the customers then do business only with them and don't do business with Paladin. So what you find is that over time, there were times when during the winter periods, the evidence shows, Northridge had as much as 25,000 out of Montana Power's 30,000 MCF on assignment from Montana Power that it was marketing. And so that was the vast bulk of what Montana Power had out there, and it was the vast bulk of the customers that were available to Paladin. I understand then, the amount of gas that's under this firm five-year contract is relatively small. But in fact, these same customers were purchasing a great deal of gas. It's just that they weren't purchasing all of it or even much of it under the five-year contract? That's correct, Your Honor. It was the cornerstone from which everything else flowed. And once they got that in place, the customers simply continued to do business with them. The evidence shows that those customers all stayed with Northridge Montana Power, except at the end of the period, there were two that didn't stay with them,  What makes that illegal under antitrust laws? I'm sorry, Your Honor. What makes that illegal under antitrust laws? What makes it illegal? Because ordinarily, you know, law firms, construction companies, suppliers of all kinds of goods and services try to sell something to a customer. And if they get the customer, they hope they'll get more business from the customer. That's not normally an antitrust violation. That is not normally an antitrust violation. But what's an antitrust violation here, Judge Gould, is that by using the five-year assignment, the $20 upfront Lockian fee and the five-year demand charges, they foreclosed Paladin from being able to compete for these customers. And this was the bulk of what Paladin could compete for in that northern market. And the end result was Paladin goes out of business, Montana Power, So instead of two purveyors of firm delivery rights, you end up with one. So that's one anti-competitive thing. That's one thing that's wrong with it. Second thing that's wrong with it is during this period, the customer had a choice of either firm delivery of NOVA or interruptible delivery. Montana Power offered that choice. Paladin would have offered that choice. When Paladin goes out of business and the five-year assignments expire, Montana Power takes away the firm delivery option and leaves customers only with the option of interruptible delivery. The third thing that's wrong is Paladin. What's wrong? Why is that anti-competitive? It's a reduction of alternatives available to consumers, Your Honor, and the antitrust. Why is that anti-competitive? You said it was anti-competitive. It is anti-competitive. How is it anti-competitive? It is anti-competitive because it injures competition, because the antitrust case law is clear that any kind, consumer alternatives are reduced. That is an injury to competition. It is an injury to consumers. And Paladin was injured as part and parcel of that. That makes it anti-competitive. The third thing that was done is consumers initially had available to them 60,000 MCF per day of these NOVA firm delivery rights. First thing that happens, Paladin goes out. Now it's down to 30. What happens when the five-year assignments are up? Montana Power cuts the 30 down to 5. So consumers start with 60,000 available to them. They end up with 5,000 available to them. It's a 12-fold reduction. The case law recognizes that that kind of a reduction of quality alternatives, I'm sorry, quantity alternatives is anti-competitive. Have you made an argument about predatory behavior? Predatory in one sense, Your Honor. I won't say predatory in terms of pricing below cost, but predatory. The ultimate purpose here and the ultimate result that Montana Power achieved is it is the one who is left standing at the carway interconnect with NOVA. It now controls 75%, which is a monopoly market share of the NOVA firm delivery at carway. And because of the other applications it's filed for six times as great an amount, 180,000 MCF per day, it has the absolute. I understand that that's the result. I'm asking whether you're making a predatory behavior argument that has led us to that position. Well, if you mean predatory, I understand predatory, Your Honor, normally in the sense of pricing below cost. They're not, yes, Your Honor, no, I'm not making that argument at all. In fact, it was the opposite. There was this 22.5 cent price differential that the customers didn't even realize, apparently, that they were incurring. They looked at the bid price for gas and Paladin's price and never realized that there were all these other components that should have been factored in that really made that end price higher than Paladin's price. And higher prices, along with reduced alternatives, either one of those and both of those are anti-competitive. So you're saying it was anti-competitive for them to charge customers a higher price than your client would charge? I am saying that the customers paying a higher price, yes, that is anti-competitive. Higher prices for consumers is anti-competitive. Yes, Your Honor, I am saying that. But I don't understand why is it that the customers paid a higher price? You said they didn't realize it. Yes, Your Honor. Why didn't Paladin explain it to them? Well, because what they do is you submit bids. That's what happens. You submit written bids. You don't even know what your competitor's bid is or what's in your competitor's bid. And then they accept one and don't accept the other, and it's too late to do anything about it. The Supreme Court of Kodak, Judge Reinhart, recognizes that in certain situations there are what are called high information costs, where the consumers don't have all the competitive information to make an intelligent choice. And I submit that's what happened here. I need to touch on two other points here before I run out of time, Your Honors. One. Are you planning on saving any time? I'm sorry, Your Honor. Are you planning on saving any time? I hope to save five minutes. I see I'm down to 2.30. You're down to two and a half. Yes, Your Honor. Let me just say that with respect to the essential facility, the key there is what is the downstream market. The downstream market, Paladin's evidence shows, is the market at Grizzly. It's not the market downstream of Grizzly on the CIG pipeline. It's the market at Grizzly. And what was done there that destroyed competition is that initially Paladin had 10,000 a day of firm delivery rights into the Grizzly Interconnect. NARCO on the other side of the valve had 10,000 in firm takeaway rights. It was a situation of competitive equilibrium, a competitive standoff. When Montana Power and NARCO implemented interruptible storage and then applied it in such a way that Paladin couldn't get gas into storage. There were numerous interruptible shippers that shipped gas into storage. And then NARCO was able to divide and conquer them because they each had small volumes. And NARCO could say to them, you know, you pay my price. I'm setting the monopoly price here. You pay my price or else. I won't buy your gas. Those customers can't get together and make an agreement not to deal with NARCO because that would be a boycott. So what happens is NARCO becomes a monopoly buyer. And that's how competition was destroyed at the Grizzly Interconnect. The final- Gas get into Colorado through another interconnect? Into CIG. Yes, your honor, gas can come into CIG in other ways. But the consumers here, but the situation here is at the Grizzly Interconnect. Montana Power has an expert who says, oh, no, the market is all downstream on CIG. Paladin's expert says there's a separate market right there at the Grizzly Interconnect where upstream sellers are trying to sell to downstream buyers. I didn't quite understand the district court's opinion. Did he make findings about the relevant market on that? He assumed that the relevant market was downstream, your honor, on CIG. And that disregarded Paladin's evidence, which is one of the problems here on summary judgment. Their place in your briefing, I didn't notice really that issue very highly developed in the briefing. It is, your honor, in whatever the letter, which might be capital letter E, which deals with the essential facility. I think our first argument deals with the downstream, what the downstream market is. If I recall correctly, Judge Gould. OK. And the final point relates to sanctions. And that is that Paladin never had a hearing on the record in court in the entire seven and a half years of this case until today, much less ever on the issue of sanctions. And this court has a well-entrenched rule that you've got to have a hearing in court. There was a notice or a motion to exclude evidence, but it didn't request sanctions. Here's what happened, your honor. And I realize I'm running out of time, but I'd be happy to answer this. Yes. I'd be happy to answer this, Judge Reinhart. What happened was there were two assessments. The first assessment, it started with a motion simply to exclude some evidence. The court said, no, I'm not going to exclude the evidence, but without any prior notice said, oh, but I am going to award costs. That was Judge Hatfield. Judge Hatfield refers the matter ultimately several years later to Magistrate Siebel. And Magistrate, after Judge Hatfield dies, then Magistrate Siebel is trying to figure out what Judge Hatfield meant by costs. And he essentially expands costs into fees and expenses. That was the first assessment. So there was never any notice before Judge Hatfield made the decision to award costs. There was never any notice that he was even considering it, and there was no chance to respond to it. It was a fait accompli. And the rule, of course, Rule 37 says it's only costs that are caused by the discovery failure. And in that instance, there were no costs caused because Montana Power took the deposition of those two experts in the normal course, just like it took every other expert's deposition. Second round of sanctions, Your Honor, there was notice because there was a motion, but there was no hearing on the record. And in neither the first nor the second assessment was there ever any written explanation. And you got to have a written explanation so the appellate court can review what was done. And you cannot glean the basis for what was done from Judge Siebel's to Magistrate Siebel's. How much was the first assessment and how much was the second? Were the two assessments separated as to amount or whatever? Yes, they were, Your Honor. I think the first one might have been, I think the total was 27, and it might have been 8 or 9 on the one and the balance on the other. I think it was 37, but the total. All right. Thank you. Yes, Your Honor. Okay. Thank you very much, Your Honor. Please. Please. The clerk. My name is Nick Verwolf. I'm appearing on behalf of the Appellee's Montana Power Company and North American Resources Company, which has the questionable acronym of NARCO. It is the position of these appellees that the decision of the U.S. District Court below in dismissing the appellant's antitrust claim was clearly correct. The reasoning is this. Plaintiff's complaint in the lower court separates into two markets, which you've heard addressed. One is the on system market in which they allege tying, boycott and a conspiracy to monopolize against their client plaintiff Paladin. Each of these requires concerted action by two or more persons. They must have a conscious commitment to a common objective, which is unlawful in itself, i.e. a horizontal agreement to fix prices, for instance, or it has an anti competitive effect in the off system market. As you've heard, they claim monopolization and attempt to monopolize by NARCO. I'm I'm somewhat confused about their relationship of how they relate MPC and NARCO with regard to the on system market, since their allegations and their complaint were solely against Montana Power Company. In both of these markets, the claims of the plaintiffs are not based on restraint of competition. Which is what the antitrust laws are aimed at. But the expansion of competition is their claim of harm. In the on system market, plaintiff's complaint is primarily aimed at the decision by Montana Power Company to offer assignments of firm transportation rights that held on the Nova pipeline system to off to on system non core customers. Plaintiff's complaint is that such action increased the universe of potential suppliers to these customers who could then secure gas supply, including firm gas supply from other suppliers, which created increased competition, which Paladin would then have to meet. In the off system, plaintiff's complaint is that through the introduction of additional services under the interstate under its interstate tariffs, which are approved by the Federal Energy Regulatory Commission, Montana Federal Energy Regulatory Commission for Montana Power Company, expanded the use of its off system transportation and provided more suppliers with opportunities to ship gas into the downstream market. They tried to bootstrap their claim with an assertion of an essential facility doctrine, which is simply inapplicable. The court is undoubtedly aware of the standard of review set forth in Matsushita Electric versus Zenith Radio, which when I looked it up, I discovered had been cited over twenty six thousand times since the decision. Fundamentally, what it says is where the record taken as a whole could not lead a rational prior effect to find for the non moving party. There is no genuine issue for trial that has been followed up in this circuit. And in recentric acid litigation, one ninety one F third ten ninety. What's that site again for citric acid? It's one nine one F third ten ninety. It's also been more recently addressed in county of Tuolumne, the Sonora Community Hospital, two thirty six F third eleven forty eight. The following facts are without any dispute. Montana Power Company's first duty is and was to serve the needs of the customers on the system in the state of Montana. That includes two types of customers. Now, previously only one core customers. That time before 1991, Montana Power sent you a bill at the end of the month via gas. No matter who you were, you got a built in. That includes the transportation. That includes storage. I include whatever costs the tariff built into that charge. And the tariffs are set by the Montana Public Service Commission. Once this in 1991, the Montana Public Service Commission entered an order which is called the unbundling order. Under that order, persons with over 60,000 a year in use of gas, industrial customers primarily could elect to unbundle their service. They would then receive transportation services from Montana Power on the system and they could buy their gas from whoever they wished. They would set it up with the transportation is unbundled from what now? I'm sorry. They could buy their transportation is unbundled from the gas from the gas. So they buy the gas supply from someone else. Right. By the transportation from Montana Power. Right. Montana Power owns the gas pipeline and its rates for providing the service provisions are set by the Montana Public Service Commission. Also in 1991, Montana Power entered into convinced CIG the downstream pipeline from Wyoming, Colorado, which was not connected to Montana Power prior to that time to make an interconnect between the two companies. So at Grizzly, where Montana Power's pipeline stops, the Colorado interstate gas line starts and it is controlled by CIG, not by Montana Power. In the fall of 1991, CIG entered into a contract with Nova to acquire certain firm transportation rights on the Nova pipeline. The Nova pipeline is an Alberta, Canada pipeline that provides delivers gas all over Canada, but also provides gas transportation down to the Montana, Canada border. And it is one of the is an important source of gas into Montana. Others had put in applications, but eventually did not follow through on their applications. So Montana Power was one of the persons that acquired firm transportation on Nova to supply what is called peaking capacity for its core customers on online. Peaking capacity is that which hits in states like Montana, Minnesota, New York and others who have very severe winters sometimes. So while you may not. So you never have a steady demand for gas in the winter with residential customers. All of a sudden you may have a massive peak requirement. So there needs to be a dependable source of supply. So Montana Power at that time, seeing that as the most dependable way available at that time, contracted for peaking capacity to cover its peaking capacity requirements by acquiring transportation on Nova to Carway, 30,000. Now, we point out that after that, that none of this transportation was expected to go into effect till 1993 when it was contracted for originally. All of a sudden, up pops Nova says, what do you know? We can make it available to you in January of 92. A few months later, Montana Power was not in position to use such transportation at that time. It didn't take you at that time. And also during the intervening period, since it had first contracted and they popped up with this capacity, it had found another potential alternative or alternative, which negated the need for all of this capacity that they had contracted in the future for. They attempted to get rid of the capacity, at least half of it, get rid of it. But Nova said, no, you have a contract. You stick to it. So you're going to have to do it. What's following this, that the occasion arose in which Montana Power Company offered assignments of Nova capacity to on-system customers. Those six of the 12, there were 12 on-system customers at that time, six of them elected to take it. Actually, there were 13 at that time. Six of them elected to take it. The other seven did not. One of them already had its own. That was Stone Container. Those six that took it did not take it for their entire gas supply. They took it for less. Some as little as 20 percent, some as high as 40 percent, none over 40 percent of their gas supply. And it was not tied to anything. All it was was that they acquired transportation on the Nova system. The rights to that and the rights to direct Montana Power to assign it to their supplier of choice. Let me understand this here. Your position is it wasn't tied to any sale of any other product. It wasn't. But the plaintiff argues that it was somehow tiding with Montana Power providing gas out of its own reserves. And some some way when when supplies were interrupted, some I may not be stating it precisely. I understand the plaintiffs because it clearly was not tied to their source of supply. It's very clear from. We have affidavits in the file. I'm contradicted by every, you know, by the customers themselves saying this was offered to us. We considered this along with other things. Every year we look at our supplier bids. We chose the supplier. Montana Power never coerced us, threatened us, did anything else with us. They didn't. When we took it, took the assignments and agreed to them. They didn't later when we chose our suppliers. But all Montana Power did was offer the availability of this assignment of firm capacity. What kind of companies, Mr. Verwolf, are the these 13 connected customers? These are fundamentally industrial customers, you would call them. One is Louisiana Pacific, which is in the tree business. Others were like Ron Palon, which is in chemicals business. And they would use these are customers that use natural gas primarily in their production as opposed to heat. What about customers for natural gas for home heating? They were not included. They were core customers still. Those were still got their bill at the end of the month. Because a home heating person would not use over 60,000 MCF a year, I hope, to heat their home. So they wouldn't be able to buy in large enough quantities, the home heaters? Right. And there's no one who buys in large quantities and divides it up for homes? Not at that time. There was Great Falls Gas, which was an on-system customer that fell within the 60,000 year. But it's a local utility district. So it would buy gas. It would buy gas from its suppliers. And then it would, as a local distribution company. So I have one question I hope you'd address. You don't address it now. I don't want to interrupt your argument order. But before you complete it. One thing about the district court's opinion that troubled me was the treatment of concerted activity. It seemed to me, I always thought concerted action historically would just be, you know, two people entering an agreement. And then you'd have a question, is it per se unlawful or is it unlawful under a rule of reason? But if you have an agreement of two entities, two corporations, you've got concerted activity. It may be legal. It may not be unlawful. But it's concerted action of some kind. I thought the district court was imposing some other kind of requirement on a finding of concerted activity. I didn't I didn't actually understand the district court to be imposing a different requirement. As they say, there's no question we aren't into agreements with the customers that we would assign them. So there is concerted action between between Montana Power and Northridge. Whether it's lawful or not, that it is concerted. That's a good question, because the cases that address the situation in which you simply do what the customer tells you to do, for instance, you make the assignment to Northridge because the customer says make the assignment to Northridge. Now, is that concerted activity between Montana Power Company and Northridge? I don't think so. What you're doing is what is directed by the customer to do. What kind of a contractual or other arrangement did you have with Northridge? None. None at all. No. Other contracts? No. No relationship with Northridge. Other than we bought gas from them for core customers sometimes, which, by the way, is when they start talking about Montana Power transferring these firm transmission rights at other times up to 17000 or 20000. That's when we were buying our own gas to supply core customers. It has nothing to do with the non-core market. And that's very clear in the record that the most that was assigned was fifteen hundred MCF or MBT use in one year on these five year programs. That's a very, very small portion of the on system non-core customer market, which probably got one, I think, less than four and a half percent. I'm sorry. Did I answer your question? Yes. Fundamentally, because I'm getting a little short on time here and I do need to address the system market. The plaintiffs or the appellants also claim there was a boycott. The boycott from their argument consists of the fact that Montana Power and the customers entered into a contract by which the customers would buy a portion by transportation rights for a portion of their gas supply from Montana Power. So apparently, since Howden then could not sell them the same firm transmit transportation that constituted a boycott because there was absolutely nothing that prevented those customers from buying their gas from anybody. The gas suppliers. And that's why we say it opened up the ability to choose suppliers to the customers. And if the court has the opportunity or has already looked at the affidavits of the customers, Plum Creek, Louisiana Pacific, all the rest of them, it's very clear that they consider this a very good option for them to allow them to choose suppliers. Was there an explanation about why the option was ended after Paladin went out of business? The issues really never come up before. Those expired. Things have changed on Nova for one thing. You were passed a lot of the credit. I didn't want to turn it back from five to one. And the option was no longer available. There's never been a an investigation of why anybody went why they went from the five year options to one year options. Indeed, during the course of those years or any number of assignments that eventually became one year options, whether it was it became a customer preference or what, I cannot tell you. How about the essential facilities? Yes. I was getting to the off system market of the essential facilities. Doctrine is pretty much addressed in Otter Tail, the Supreme Court decision. Now, the Alaska Airlines case on the night to have an essential facility, it must be able to eliminate competition in the downstream market. Simple as that. You must own something that allows you to eliminate competition in the downstream market. There is no considering the fact that this downstream market for Montana power had existed for many years before the interconnect was even built between Montana Power and CIG. It's implausible, if not impossible. How there could be any essential facility in the grizzly interconnect to Montana Power. I've got a question about that. Is it is the downstream market gas, natural gas in Colorado or what is the downstream market? Well, the any of the markets served by the Colorado Interstate Gas and Outlines, it goes all the way to Texas. It goes to Oklahoma. It goes to California. Just everything downstream of Montana's border. Everything. The first lateral that it goes into does two hundred and twenty five thousand MCF per day. Now, this is in comparison to Narcos holding ten thousand. There's two hundred and twenty five thousand a day. And this is all in the record. The takeaway from the grizzly interconnect to the lateral does at least fifty two thousand a day capacity. And remember, CIG only has ten thousand into that interconnect. If you look at the records and I would refer the court specifically to the Dave Morris affidavit, which sets out the various, which is very revealing insofar as the markets. First of all, it shows who all the suppliers, how the suppliers grew and grew and grew in number over the years and how the suppliers of the interstate transportation grew and grew. And actually, one of the biggest ones became Enron. And the smallest, one of the smallest ones was Narco. Also, the ten thousand, there was only one person that held rights from the Canadian border to the grizzly interconnect that had priority. And that was Paladin. Ten thousand a day. They were the only ones that held it from ninety two on. Eventually, when they gave it up, they sold it for seventy thousand dollars to the first company that had previously been their supplier, who then utilized it until its term expired. And that was the only company that had priority at ten thousand a day to that pipeline. One of the essentials of the essential facility doctrine is that the party be denied access. Even if you said it was an essential facility. We have to demonstrate a denial of access, which is absolutely impossible in these circumstances. Counselor, you've got one second. You want to sum up in 30 seconds? Yes. Thank you, Your Honor. Our position is very simple. Antitrust cases, cases should be aimed at antitrust activities. Antitrust activities are those which decrease competition, not which add to it. You do not decrease competition when you add to the scope of supply available to consumers. And that's all that happened here. Paladin's problem was that once competition entered it because of its either its lack of funding or whatever, it could not compete with incoming competition price wise or otherwise. I didn't get a chance to me to to discuss this price issue. No, you won't be. You've already almost doubled your 30 seconds. But thank you very much. Thank you. Well, you have also run out of time, but we'll give you one minute if you promise to speak. Thank you very much, Your Honor. If I may, the single most important thing that I can say here is I invite this court to look at Judge Posner's recent decision in the fructose antitrust litigation, which we cited as a supplemental authority. What you've heard from me was Paladin's version of the evidence. What you've heard from Mr. Verwolf is Montana Power's version of the evidence. And what the fructose opinion suggests is now here's what you do in evaluating these conflicting versions of the evidence in a summary judgment context. When you do that, I submit that Paladin has more than sufficient evidence when you view it all as a whole. View all of Paladin's evidence as a whole. Take all of Paladin's evidence as true. Not this little piece, that little piece. Put it all together. When you do that and square it with what Judge Posner says in the fructose litigation, I submit that you will find that Paladin has sufficient evidence to get to the jury. Thank you very much, Your Honor. Thank you. The case to be argued will be submitted. Did you want to go straight through? I think I should. Okay. Let's take a break. The court will take a brief recess before the next case. All rise. This court is recessed.
judges: Reinhardt, W Fletcher, Gould